SCHARF BROS. CO., INC. *v.* UNITED STATES

**No. 4420.**—Invoices dated Pontefract, England, November 13, 1935, etc.
Certified November 14, 1935, etc.
Entered at New York November 27, 1935, etc.
Entry No. 766089, etc.

(Decided October 21, 1938)

*Barnes, Richardson & Colburn* (*Samuel M. Richardson* and *Hadley S. King* of counsel) for the plaintiff.

*Charles D. Lawrence,* Acting Assistant Attorney General (*Richard F. Weeks,* special attorney), for the defendant.

EVANS, Judge: In each of the reappraisement appeals listed in schedule A annexed and made a part hereof the merchandise, confectionery, was appraised on the basis of the foreign-market value under section 402 (c) of the Tariff Act of 1930. The importer appealed to reappraisement and claims that the proper basis upon which to assess duty is the United States value of said merchandise as defined in subsection (e) of said section 402. Only two types of merchandise are involved. One type consists of a small circular cake of licorice candy about the size of a quarter upon one surface of which are stamped the words "Mayfair Licorice Cake." The reverse side is flat. The other variety is a mixed candy designated on the invoice as Mayfair Licorice All Sorts. The expression "all sorts" appears to be used synonymously with the word "mixed" as applied to candy.

The importer offered in support of his appeal the testimony of two witnesses and an affidavit of the managing director of the manufacturing concern in England, together with samples of the merchandise involved.

The Government called as its witness the examiner who passed upon the merchandise under whose testimony certain exhibits and special agents' reports were admitted.

The first witness for the plaintiff was an officer of the importing company who made the contract in England for the purchase of the merchandise involved herein. He testified that he had seen mer-

chandise of this type manufactured in England and that he was familiar with the component parts of each of these types of confectionery.

Taking up the licorice cakes first, he stated that the imported variety known as Mayfair licorice cakes, was different from the licorice cakes manufactured and sold in England by the concern that made the imported merchandise, to wit, Dunhills; that their product was known in the English market as Spanish Buttons; that they were made in a mould from a mixture that had to be slightly different because it was to be moulded, than the mixture used in the imported licorice cakes. He stated that the Spanish Button (the product which is sold in England) "is a moulded hot product; the Mayfair Cake is a cold process, made similar to the manner in which you would make cakes, such as stamping them out of a dough."

The following then took place:

Judge EVANS. Will you describe a little more particularly the moulding process? As I gather or surmise they have moulds the shape of the button.

The WITNESS. Yes, with the impression in the moulds of the item itself, in order to be able to mould effectively.

Judge EVANS. Then the materials are moulten and poured on?

The WITNESS. Yes, sir, in order to mould the materials, in their preparation, you must anticipate the moulding process, so the formulas are not alike, whereas in the instance of the "Mayfair Cake," a cold dough is prepared and the individual cakes are stamped out cold.

On the question of the difference in appearance between the Spanish Buttons and the Mayfair Cakes this witness gave the following testimony in answer to questions:

By Mr. RICHARDSON:

Q. Let's continue with the process. Are you able to state the difference in visual aspect of the Spanish Button, and the Mayfair cakes?—A. Yes.

Q. What is the difference?—A. The Mayfair Cake, because of its process——

Q. Because of the moulding process?—A. The stamping process, is not a very bright shiny product, whereas the Spanish Button because of the formula and process has a very high lustre and is different in appearance.

Q. Now how about the components of the "Mayfair Cakes" and the "Spanish Button"?—A. The Spanish Button is a hard licorice; the Mayfair Cake is a soft licorice. The Spanish Button contains a great deal more gelatine.

Q. How do you know that?

Mr. WEEKS. I move to strike that out. He has not given us the formula he saw.

Judge EVANS. The question he has just put to the witness I think will bring it out.

Mr. WEEKS. Exception.

Judge EVANS. If he has seen it.

By Mr. RICHARDSON:

Q. How do you know that?—A. We have it a hard product, and the——

Q. You have seen it made?—A. Yes.

Q. You saw the gelatine put in it?—A. Yes, sir.

Mr. WEEKS. I object to Counsel leading the witness.

By Mr. RICHARDSON:

Q. Do you know whether there was any difference in the kind of licorice?—A. There are two different grades of licorice used in the manufacture of these two products.

Q. Which was used in the Spanish Buttons?—A. Product made in Smyrna.

Q. A product made in Smyrna?—A. Yes.

Q. What is it called?—A. I believe "licorex."

Q. And what was the licorice product used in the Mayfair cakes?—A. An American prepared product.

Q. In regard to size, is there any difference in the size between the Spanish Button and the Mayfair Cakes?—A. The Spanish Button is smaller in size. The Spanish Button is perfect in shape, and has a very clear impression on it; produced by the mould. The Mayfair Cake is large.

Q. Did you see or have you seen in Great Britain, the packages in which the Spanish Buttons are sold?—A. I have.

Q. Can you describe the difference in the packaging between that and the Mayfair cakes which you import?—A. The liquorice buttons—

Q. The Spanish buttons?—A. The Spanish Buttons are packed in seven pound wooden boxes, that were decorated, lace paper used inside the boxes for decorative purposes. The boxes had decorated labels on, and sixteen of these boxes, packed in an outside wooden box.

The witness identified a box of the Mayfair Cakes as representative of the importation and the same was received in evidence and marked Exhibit 2. His attention was called to the fact that these cakes in Exhibit 2 were more or less stuck together and he claimed that it was due to the stamping process. If they were moulded they would not stick together that way, he said. He further stated that the Spanish Buttons had an impression on each side, or, as he stated, were "moulded on both sides."

Concerning the Mayfair Licorice All Sorts candy the witness stated that All Sorts meant a mixture of all kinds, creams and licorice filled, a mixture of various shapes and colors. He stated that he had seen the Dunhills All Sorts and the Dunhills Tower Brand All Sorts and gave considerable testimony as to the differences between these and the Mayfair All Sorts.

This witness stated that there were about 15 different pieces in the Tower Brand and in the Mayfair All Sorts there were 7 different pieces. He then gave the following testimony:

Q. Can you state from your knowledge what the difference, how the ones that are not in the "Mayfair All Sorts" differ from the ones that are included in the "Tower Brand All Sorts"?—A. Cocoanut coated pieces that are in the "Tower Brand All Sorts", and the soft gelatine pieces that are in the "Tower All Sorts" are left out of the "Mayfair All Sorts", with the exception of one piece which is included. "Tower All Sorts" is a different sort of cocoanut piece, not in the Mayfair mixture.

Q. Can you state from your knowledge of the candy business whether these candies, including cocoanuts are more or less expensive?—A. The cocoanut is a more expensive ingredient than sugar or licorice. The amount of glycerine contained is very small in its cost per hundred pounds, but where these things are measured, cocoanut would be one of the predominantly expensive materials used.

He stated that the amount of cocoanut used in the Tower Brand as compared with the "Mayfair" mixture would make "a differential of $1.00 to $1.10 per hundred pounds."

Concerning the packing he stated that the Tower Brand All Sorts was packed in "7 pound wooden boxes decorated with lace paper edging, and the boxes are covered with printed labels describing the merchandise, done in colors, and 16 of these wooden boxes are packed into an outside wooden box for shipment." Sometimes they were packed in 4-pound boxes, and 28 four-pound boxes to a case. He further stated that the Mayfair All Sorts are packed in the same type box as the Mayfair Cakes, that is, 14 pounds and four boxes are banded together with an iron band for shipment and an outside case used for them. He then identified a Mayfair All Sorts box of mixed candy which was representative of this type of candy and the same was received in evidence and marked "Exhibit 4."

This witness further stated that under his contract with Dunhill he was the exclusive purchaser of this merchandise in this country.

On cross-examination after reference to the Licorice (Mayfair) Cakes he was asked if he knew the component parts of the Spanish Buttons, to which he answered "Yes". Then he was asked to state how much sugar, how much glucose, and how much other materials the Spanish Buttons contained. His answer was as follows:

A. The glucose percentage in Spanish Buttons would run very similar, but you see that item of 70 per cent of other materials, that would be quite different.

He was then asked:

X Q. Will you tell us what the other materials in the Spanish Buttons are?— A. Contains more gelatine.

X Q. More gelatine?—A. That is right.

X Q. Any other difference?—A. That in itself is sufficient, that is the most expensive item.

X Q. Is there any other difference in the component parts so far as the other materials?—A. Yes. the licorices are different.

X Q. And how does the amount of licorice in the Spanish Buttons compare with the amount of licorice in the "Mayfair Cakes," if you know?—A. The two products that are used for the manufacture, one is made in Smyrna, and the other is a United States product, a product made in the United States, is a prepared product.

X Q. It is not a question of how much it contains. It is a question in the difference of the licorice itself.—A. It is not a question of how much it contains. It is a question in the difference of the licorice itself; yes.

Concerning the All Sorts varieties, on cross-examination he stated in substance that the difference between the two varieties was accounted for by the absence from the Mayfair brand, to wit, Mayfair Licorice All Sorts, of the shapes that contained cocoanut and shapes that were gelatine pieces.

Mr. Joseph W. Scharf, treasurer of the importing company, gave testimony intended to establish the United States value of this merchandise.

The Government examiner stated that he had appraised the merchandise on the basis of the special agent's report, Exhibit 5, herein and the exhibits therein referred to, and claimed that the report showed that the Spanish Buttons were like the Mayfair Licorice Cakes and that the Dunhills All Sorts was like the Mayfair All Sorts.

The special agent's report (Exhibit 5) shows that he visited the plant of the manufacturer, that is, Dunhills, Ltd., of Pontefract, England, and there interviewed Mr. Frank Godson, the managing director, on August 28, 1935. Mr. Godson is the same person who made the affidavit introduced in evidence as Exhibit 1. The report verifies the statement that Scharf Bros. Co., Inc., was the sole representative in the United States of Dunhills for the sale of this type of merchandise.

With reference to Mayfair Licorice Cakes, the report states that they differ from the Best or Pontefract Cakes only in the kind and quality of licorice used and in the packing. The special agent thereupon compares Mayfair Licorice Cakes with a commodity called "Best." At another page of his report he identifies as Exhibit B a sample of the Spanish Buttons received in evidence as Exhibit 5. It bears the words stamped thereon "Tower Brand." In the report the special agent states:

The Mayfair licorice cakes are similar to the manufacturer's "Spanish Buttons," which they sell in the home market. Mr. Godson admitted that the only difference was in the name. He stated that if an order were received for the Mayfair cakes, and he had a mixing of the "Spanish Buttons" made up, he would use this mixing for making up the Mayfair cakes.

According to Exhibit 5, the special agent's report, Mr. Godson was interviewed at the plant in August 1935, at which time apparently he gave the special agent full and complete information about the merchandise exported to the Scharf Bros. Co., Inc., as well as about the other products manufactured by Dunhills and claimed by the Government to be a similar product. The same special agent visited Dunhills' plant in October 1936, and further interviewed Mr. Godson in regard to details of the types of candy used in the All Sorts varieties manufactured by them. The report (Exhibit 6) makes the following statement in the concluding paragraphs:

Mr. Godson read the former report dated September 6, 1935, file 106/378, and after reading it, he stated that it was correct, except that on page 3, under Foreign Value, "Mayfair" Liquorice Allsorts, he claimed that the "Mayfair" and "Tower Brand" Allsorts were "not quite" the same. The details of the differences are shown above. Also, under "Mayfair Liquorice Cakes," he claimed that a more accurate wording would be "The Mayfair liquorice cakes are 'more-

or-less' similar to the manufacturer's Spanish Buttons." The differences between the "Mayfair" Liquorice Cakes and the Spanish Buttons are shown above.

Aside from the two exceptions noted above, Mr. Godson stated that the previous report referred to was correct.

In December 1937, Mr. Godson executed an affidavit (Exhibit 1 herein). The affidavit recites briefly the circumstances under which his concern began exporting merchandise of the type here involved to the plaintiff herein, and gives an explanation about the reason for making whatever changes were made in the types sent here as compared with those sold in England. These details, it appears to the court, are not of much, if any, importance in determining the issue involved. The affidavit does point out what Mr. Godson conceives to be the differences between the imported types and the home consumed types. He states that Mayfair cakes are made as follows:

The Mayfair cakes were made from Crown brand Liquorice paste while the Spanish Buttons were made from Licorex. The Crown brand liquorice paste is a much less expensive and inferior type of liquorice paste and contains definitely less Glycyrrhizin than the Licorex. The Crown brand paste is a product of the United States, while the Licorex is a product of Smyrna, manufactured there and shipped to Great Britain.

The workmanship on the Mayfair cakes is inferior to the workmanship on the Spanish Buttons and the packing of the Mayfair cakes is definitely cheaper than that used for the Spanish Buttons, being packed in 7 pound boxes and Mayfair cakes always packed in 14 pound boxes.

The effect of this testimony is considerably weakened by the statements made to the special agent as reported in Exhibit 5, particularly in view of the fact that in the concluding paragraphs of Exhibit 6 quoted above it appears that Mr. Godson read the special agent's report (Exhibit 5) and made the very slight corrections noted above. The court observes, however, that in Exhibit 5 in making a comparison of Mayfair Cakes with Dunhills Best (which he identifies on page 4 of the report as Pontefract cakes), Exhibit C, the special agent states that Licorex was used in the manufacture of Mayfair Cakes, while in the report Exhibit 6 the same agent states that the only difference between Mayfair Licorice Cakes and the Spanish Buttons is in the type of licorice used for each and the stamping on each. He states:

"Mayfair" Liquorice Cakes are now made from Crown Brand Liquorice paste, and Spanish Buttons from Licorex.

If licorex was used in Mayfair Licorice Cakes in August 1935, and in October of the following year the manufacturer has adopted the use of Crown licorice paste and was making the Spanish Buttons from licorex, it would seem a fair inference from the fact that they had shifted for home use from licorice paste, from which they were making their Pontefract Cakes to licorex for the Spanish Buttons, that there is a slight difference in the cost between these ingredients. This

inference is borne out by the figures given in the special agent's report (Exhibit 5), as follows:

|  | *Mayfair* | *Best* |
|---|---|---|
| Licorice used_____ | Licorex, which costs manufacturer 51/—per cwt. net. | B V B Licorice paste, which costs manufacturer 60/—per cwt. less 2½%. |
| Amount of Licorice used__ | 56 lb. licorex in a mixing weighing 9 cwt. | 84 lb. licorice paste in a mixing weighing 9 cwt. |

Exhibit 6 states that the difference in cost per cwt. between the foreign brand licorice paste as used in the Mayfair cakes and the licorex as used in the Spanish Buttons was 8d. per cwt. of the finished product.

In the witness Lou Scharf's testimony quoted above he stated that the Spanish Buttons contain more gelatine than the Mayfair licorice cakes. Both the special agent's reports indicate that the information given the special agent was to the effect that all other materials in these two varieties of licorice cakes were the same (see Exhibits 5 and 6). Mr. Lou Scharf also states that there is a difference in the method of manufacture such as made one a better and brighter product than the other, and that the Spanish Buttons were stamped on both sides. So far as the appearance of the samples is concerned, there is very little difference between the two and the samples of Spanish Buttons introduced in evidence show that they are stamped on but one side.

The reports indicate that all the buttons are stamped. If as a fact they are all stamped the witness' statement that the words were moulded in the button is not correct. It probably would not be practical to mould them and subsequently stamp them.

It is a significant fact that in Exhibit 1, the affidavit of Mr. Godson, in discussing the workmanship of these cakes as quoted above, there is no mention nor is there a claim asserted that the Spanish Buttons were made differently or better than the Mayfair Cakes.

The court is of the opinion that the evidence of difference consisting, as I believe it does, only of a difference in the types of licorice used, which made but a slight difference in the cost, is not sufficient to overcome the presumption of correctness attaching to the appraiser's action in appraising the licorice cakes on the basis of foreign-market value of the same.

Concerning the Mayfair Licorice Allsorts Mr. Godson in his affidavit Exhibit 1 stated that:

In order to produce a cheaper article in the Mayfair Liquorice Allsorts, the Sugar, Glucose and Treacle contents were reduced from that shown in the Tower Allsorts from 65% to 58½%, the balance of approximately 7% being made up of Flour with a higher percentage of Treacle and Brown Sugar as against White Sugar and Glucose.

The witness Lou Scharf would have the court believe that the difference between the two types consisted in the fact that certain more expensive shapes or varieties found in Dunhills Tower Brand Allsorts had been omitted in the Mayfair Allsorts and that there were fewer varieties of shapes in the Mayfair Allsorts. He stated that there were 7 different shapes or types of candy in the Mayfair All Sorts, while the special agent's report shows that there were 10, and Exhibit 4 as produced by the plaintiff contained 10 different types or shapes. Mr. Lou Scharf claimed that the cocoanut pieces that were in the Tower Brand and the soft gelatine pieces found in the Tower Brand All Sorts, were left out of the Mayfair All Sorts, with the exception of one piece which is included. An examination of Exhibit 4 produced by the plaintiff discloses that there were the same number of types of cocoanut pieces in the Tower Brand and the Mayfair Brand. These types were known as yellow rock and pink rock. Concerning the gelatine pieces there were likewise 2 varieties in Mayfair All Sorts and 2 varieties in the Tower Brand All Sorts, to wit, pink nonpariel and blue nonpariel.

As near as the court can determine from the exhibits, the following varieties or shapes found in the Tower Brand were not present in the Mayfair, to wit, pink and white diamonds, glazed licorice plug (although there was present a twisted licorice plug), roly poly slices, licorice cream rock, and white nonpareil (gelatin).

Referring to Exhibit 1, affidavit of Mr. Godson, he states that:

In order to produce a cheaper article in the Mayfair Liquorice Allsorts, the Sugar, Glucose and Treacle contents were reduced from that shown in the Tower Allsorts from 65% to 58½%, the balance of approximately 7% being made up of Flour with a higher percentage of Treacle and Brown Sugar as against White Sugar and Glucose.

As quoted in Exhibit 6 at the time of the interview, October 14, 1936, Mr. Godson stated to the special agent:

The Mayfair Liquorice Allsorts are made up from the point of view of reducing the price and, therefore, more of the black twisted plug is included in the mixing, reducing the sugar, glucose, and treacle contents from 65% to 58½%, the balance of approximately 7% being made up in flour with a rather higher percentage of treacle and brown sugar, as against white sugar and glucose. Several of the various pieces are also entirely omitted from the "Mayfair" Liquorice Allsorts.

It will be noted in the latter quotation that more of the black licorice plug is included in the mixing reducing the sugar, glucose, and treacle content from 65 per centum to 58½ per centum. Exhibit 6 gives the glazed licorice plug percentage in the Tower mixture as 17.5 per centum. Assuming that twisted licorice plugs in the Mayfair All Sorts are the same as glazed licorice plugs, we note that the percentage of licorice plugs in the Mayfair is 9.7 per centum to a mixing, or a difference of 7.8 per centum. This reduction of percentage of this

type of candy may have made some slight difference in the cost of production, but cost is not the controlling element in determining similarity. It certainly has made no difference in the appearance nor the use of the mixture.

The court has laid down the rule for determining similarity. The leading case is *United States* v. *Irving Massin*, 16 Ct. Cust. Appls. 19, T. D. 42714. The court there stated:

In view of the common meaning of the word "similar" and of the authorities cited, we are of opinion, and so hold, that if goods are made of approximately the same materials, are commercially interchangeable, are adapted to substantially the same uses, and are so used, ordinarily, they are similar, within the meaning of section 402 (b). The importer or foreign manufacturer may not, by making a few changes in structure, or in giving the product a new name, or by restricting its sale to the American purchaser only, *ipso facto* remove his merchandise from section 402 (b), the foreign value provision.

That rule has been cited with approval and followed in numerous later cases. See the following: *Charles Hardy, Inc.* v. *United States*, 21 C. C. P. A. (Customs) 173, T. D. 46509; *United States* v. *Thomas & Co.*, id. 254, T. D. 46788; *United States* v. *Cramer & Co.*, id. 379, T. D. 46911; *United States* v. *Freitag & Sons, Inc., et al.*, id. 500, T. D. 46961; *United States* v. *American Bluefriesveem, Inc.*, 22 C. C. P. A. (Customs) 67, T. D. 47063; *United States* v. *Briones & Co., Inc.*, id. 245, T. D. 47158; *Japan Import Co.* v. *United States*, 24 C. C. P. A. (Customs) 167, T. D. 48642.

In the *Thomas* case, Lenroot, J., in a specially concurring opinion, stated his views as to the question of commercial interchangeability as follows:

In my opinion, if goods are made of approximately the same materials, are of the same approximate commercial value, are adapted to substantially the same uses, and are so used, then they are similar whether commercially interchangeable or not. The goods here in issue and the goods sold in Czechoslovakia are made of approximately the same materials, are approximately of the same commercial value, are adapted to substantially the same uses, and are so used, and are therefore similar within the statute, notwithstanding that, as above set forth, I do not believe them to be commercially interchangeable.

Although there is a slight difference in the character of the packing in the merchandise shipped to this country, that difference does not render the imported merchandise dissimilar or essentially different from the merchandise sold in the foreign market.

Based upon these legal principles it is the opinion of the court that the evidence herein fails to establish the plaintiff's case with reference to the Mayfair Licorice All Sorts. I therefore hold that with reference to this item the evidence fails to overcome the presumption of correctness attaching to the appraiser's finding of value. I therefore affirm those values in each case.

Judgment will be rendered accordingly.